UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 10–01966 MMM (AGRx) | Date | April 22, 2010 |
|---|---|---|---|
| Title | Super-Krete International, Inc. v. Rod Sadleir, et al. | | |

| Present: The Honorable | DALE S. FISCHER, United States District Judge |
|---|---|

| Debra Plato | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |
| Attorneys Present for Plaintiffs: | Attorneys Present for Defendant: |
| Not Present | Not Present |

**Proceedings:**   (In Chambers) Order GRANTING Plaintiff's Application for a Preliminary Injunction

   On April 14, 2010, the Court granted Plaintiff's ex parte application requesting a Temporary Restraining Order ("TRO") enjoining Defendant Concrete Solutions, Inc. from transferring or selling the domain name <supercrete.com> to any third party pending resolution of the claim filed against Defendants for cyberpiracy under 15 U.S.C. § 1125(d).  Subsequently, the parties briefed Plaintiff's further request for a preliminary injunction, appearing before the court on April 22, 2010 for oral argument on the matter.  For the reasons noted below, the Court GRANTS Plaintiff's request for a preliminary injunction enjoining Defendant Concrete Solutions, Inc. from transferring or selling the domain name <supercrete.com> to any third party pending resolution of the claims raised in this action.

## I.  FACTUAL BACKGROUND

   Plaintiff Super-Krete International, Inc. is a California corporation specializing in the sale of products for the repair and restoration of existing concrete.  (Holwitz Dec. ¶ 3.)  Plaintiff owns federal trademark registrations for the marks "Super-Crete," "Super-Krete," and "Super-Krete Products" ("the Marks") for use in connection with the sale and marketing of its products.  (Id. at ¶ 4.)  Plaintiff's Marks were filed with the U.S. Patent and Trademark Office ("USPTO") on September 24, 1999 and subsequently registered under U.S. Registration Nos. 2,375,309, 2,377, 606, and 2,589,070.  (Id. at ¶ 4; Ex. A).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

Plaintiff states that its principal, John L. Holwitz, first obtained ownership of the previously registered trademark for "Super-Crete" on April 14, 1995. (Id. at ¶ 5.) In support, Plaintiff has produced an assignment contract, indicating that Loren Eugene Hale transferred all interest in the "Super-Crete" mark, as previously registered under U.S. Registration No. 1102137, to Holwitz on that date. (Id. at Ex. B.) This prior registration was filed with the USPTO on October 10, 1975 and indicates that the mark's first use in commerce was in 1966.[1] The current registration for the "Super-Crete" mark also indicates the first use in commerce as 1966. (Id. at Ex. A.)[2] The registrations for the "Super-Krete" and "Super-Krete Products" marks indicate a first use in commerce of 1989 and May 1996 respectively. (Id.)

The declaration of Plaintiff's president, Tracey Holwitz, states that the company has "continuously exploited" the "Super-Crete" mark since its acquisition in 1995, and that the company actively promotes its products under the Marks. (Id. at ¶¶ 5–8.) Specifically, Holwitz declares that the company uses the Marks in connection with online promotion of its products by owning and operating the website domains <super-crete.com>, <super-krete.com>, <super-crete.ca>, and <super-krete.ca>. (Id. at ¶ 8.)

Defendant Concrete Solutions, Inc. competes against Plaintiff in the concrete resurfacing, restoration, and sealant market. (See Sadleir Decl. ¶ 3). Defendants' operations are located less than seventeen miles from Plaintiff's location. (Holwitz Decl. ¶ 9.) Plaintiff contends that Rod Sadleir, President of Concrete Solutions and also a defendant in this action, developed a limited business relationship with Plaintiff's founder in the early 1980's and subsequently monitored Plaintiff's business activities. (Id. at ¶ 9.)

On March 17, 1999, Sadleir registered the domain name <supercrete.com> and directed all traffic from this site to the website for Concrete Solutions at

---

[1] The Court takes judicial notice of the prior registration of the "Super-Crete" mark under registration no. 1102137, as provided on the USPTO's website. See Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001) ("[U]nder Fed. R. Evid. 201, a court may take judicial notice of 'matters of public record.'") (quoting Mack v. South Bay Beer Distrib., 798 F.2d 1279, 1282 (9th Cir. 1986)); Kos Pharmaceuticals, Inc. v. Andrx Corp., 369 F.3d 700, 705 n.5 (3d Cir. 2004) ("According to records available on the PTO website, a Notice of Allowance for the ALTOPREV mark was issued on February 24, 2004. We may take judicial notice of such public records."). This information is not disputed, though Defendants apparently dispute the validity of the assignment.

[2] The evidentiary objection is overruled.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

<concretesolutions.com>, which offers products in direct competition with Plaintiff. (Sadleir Decl. ¶ 5; Holwitz Decl. ¶ 10.) Sadleir declares, however, that Concrete Solutions has never used the terms "supercrete" or "super-crete" on its website. (Sadleir Decl. ¶ 6.) Sadleir states that at the time of registering <supercrete.com>, he was "unaware of any trademarks allegedly owned by Plaintiff." (Id. at ¶ 7.) Five months after registering the site, Sadleir received an e-mail from Tracey Holwitz indicating Holwitz was aware of the potentially infringing website. (Id. at ¶ 7.)

Sadleir heard nothing further from Plaintiff regarding the website until 2007. (Id. at ¶ 8.) On September 23, 2007, Sadleir offered to sell the <supercrete.com> domain name to Plaintiff for $15,000. (Holwitz Decl. ¶ 11.) Plaintiff filed an arbitration action in September 2008 with the World Intellectual Property Organization ("WIPO"), seeking transfer of the <supercrete.com> domain. (Sadleir Decl. ¶ 9.) The WIPO panel denied Plaintiff's claim for transfer, stating that Plaintiff had failed to provide evidence of commercial use of the Marks prior to the site's registration by Sadleir and finding that there was no prior use of the Marks and that the term "supercrete" was descriptive. (Id., Ex. B)

On March 18, 2010, Plaintiff filed this action alleging, inter alia, trademark infringement and dilution under 15 U.S.C. §§ 1114, 1125 and cyberpiracy under 15 U.S.C. § 1125(d). Following the filing of the suit, Defense counsel notified Plaintiff that Defendants were considering selling the domain name <supercrete.com> to a third party – possibly from abroad. (Rome Decl. ¶ 5; Bjorgum Decl. ¶ 3.) Defense counsel would not agree to the requested stipulation that Defendants would not sell the domain name until after Plaintiff's claims had been adjudicated here. (Rome Decl. ¶ 6; Bjorgum Decl. ¶ 3.) Defense counsel contends these discussions were made as part of an attempt to settle the case. (Bjorgum Decl. ¶ 4.)

### II. DISCUSSION

#### A. Legal Standard

A district court should enter a preliminary injunction only "upon a clear showing that the plaintiff is entitled to such relief." Winter v. Natural Resources Defense Council, Inc., – U.S. –, 129 S.Ct. 365, 375 (2008). Such a showing requires that plaintiff establish it "is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." Id. at 374.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

    **B.    Plaintiff's Likelihood of Success on the Merits**

    Under the Anticybersquatting Consumer Protection Act ("ACPA"), Congress provided civil remedies for trademark holders seeking relief against parties infringing upon their marks in connection with website domain names. 15 U.S.C. § 1125(d); see Bosley Med. Inst., Inc. v. Kremer, 403 F.3d 672, 680 (9th Cir. 2005) ("[C]ybersquatting occurs when a person other than the trademark holder registers the domain name of a well known trademark and then attempts to profit from this by either ransoming the domain name back to the trademark holder or by using the domain name to divert business from the trademark holder to the domain name holder."). As part of its cyberpiracy claim under § 1125(d), Plaintiff seeks the specific injunctive relief of a transfer of the <supercrete.com> domain name from Defendants to Super-Krete, Inc.[3] (Complaint ¶ 48.) Based on the concern that control of <supercrete.com> domain would not be recoverable if the domain name was sold to a third party prior to the conclusion of this litigation, Plaintiff sought an ex parte TRO to enjoin any such sale and now seeks a preliminary injunction to extend this bar during the remainder of this case.

    To support a claim for cybersquatting under § 1125(d), a plaintiff must prove that the defendant:
    (I) has a bad faith intent to profit from [a] mark . . . ; and
    (ii) registers, traffics in, or uses a domain name that --
        (I) in the case of a mark that is distinctive at the time of registration of the domain name, is identical or confusingly similar to that mark;
        (II) in the case of a famous mark that is famous at the time of registration of the domain name, is identical or confusingly similar to or dilutive of that mark; or
        (III) is a trademark, word, or name protected by reason of section 706 of Title 18 [the Red Cross] or section 220506 of Title 36 [the Olympics].
15 U.S.C. § 1125(d)(1)(A); see also Bosley Medical Institute, 403 F.3d at 681 ("[A] 'trademark owner asserting a claim under the ACPA must establish the following: (1) it has a valid trademark entitled to protection; (2) its mark is distinctive or famous; (3) the defendant's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, the owner's mark; and (4) the defendant used, registered, or trafficked

---

[3] 15 U.S.C. § 1125(d)(1)(C) provides that "[i]n any civil action involving the registration, trafficking, or use of a domain name under this paragraph, a court may order the forfeiture or cancellation of the domain name or the transfer of the domain name to the owner of the mark."

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

in the domain name (5) with a bad faith intent to profit.'" (quoting <u>DaimlerChrysler v. The Net Inc.</u>, 388 F.3d 201, 204 (6th Cir. 2004)).

### 1.     **Plaintiff's Valid and Distinctive Mark**s

Plaintiff has adduced evidence of ownership of registered trademarks for the terms "Super-Crete," "Super-Krete," and "Super-Krete Products" in connection with the sale of products for the repair and restoration of existing concrete. (Holwitz Decl. ¶ 4; Ex. A). "Super-Crete" – the mark most similar to the domain name at issue – was first registered as a trademark in 1975, twenty years before Sadleir registered the disputed domain name. While Defendants make the general argument that the "Super-Crete" mark is descriptive and not distinctive, the mark's registration with the USPTO is sufficient evidence to establish its distinctiveness and validity. <u>Lahoti v. VeriCheck, Inc.</u>, 586 F.3d 1190, 1199 (9th Cir. 2009) ("[F]ederal trademark registration of a particular mark supports the distinctiveness of that mark, because the PTO should not otherwise give it protection. Registration alone may be sufficient in an appropriate case to satisfy a determination of distinctiveness."); <u>see</u> 15 U.S.C. § 1115(a) (stating that PTO registration is "prima facie evidence of the validity of the registered mark"). Accordingly, the Court finds that Plaintiff will likely be able to establish that its Marks are valid and enforceable under the ACPA.

### 2.     **Defendants' Registration and Use of a Confusingly Similar Domain Name**

In determining whether there is confusing similarity under the ACPA, courts compare the plaintiff's mark with the name of the website. <u>See</u> <u>Coca-Cola Co. v. Purdy</u>, 382 F.3d 774, 784 (8th Cir. 2004) (holding that there was a likelihood of confusion under the ACPA where defendant had registered websites including www.my-washingtonpost.com, www.mymcdonalds.com and www.drinkcoke.org); <u>Louis Vuitton Malletier & Oakley, Inc. v. Veit</u>, 211 F.Supp.2d 567 (E.D. Pa. 2002) (holding that plaintiff owning Louis Vuitton mark was entitled to default judgment on ACPA claim based on defendant's use of domain name www.LouisVuitton-replicas.com); <u>Graduate Mgmt. Admission Council v. Raju</u>, 267 F.Supp.2d 505 (E.D. Va. 2003) (holding that plaintiff owning GMAT mark was entitled to default judgment on claim under the ACPA where defendant used domain names www.GMATPLUS.com and www.GMATPLUS.net and was selling past test questions from the Graduate Management Admission Test (GMAT)).

A court should not look beyond the domain name to consider the content of the

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

website. Purdy, 382 F.3d at 783. "The inquiry under the ACPA is thus narrower than the traditional multifactor likelihood of confusion test for trademark infringement." Id. Consequently, even if it might be evident from the content of the website that it is not sponsored by or affiliated with the plaintiff, there may nonetheless be a violation of the ACPA. Id.; see also People for Ethical Treatment of Animals v. Doughney, 263 F.3d 359 (4th Cir. 2001) (holding that domain name www.peta.org violated the ACPA because it was identical to the mark of the plaintiff, People for the Ethical Treatment of Animals, even though a visit to the site itself revealed that it was a parody and that the initials "peta" stood for People Eating Tasty Animals). On the other hand, if the name of the website at issue itself makes clear that it is not affiliated with the plaintiff's mark, there can be no likelihood of confusion. See, e.g., The Taubman Co. v. Webfeats, 319 F.3d 770, 777 (6th Cir. 2003) (holding that there was no likelihood of confusion on part of plaintiff who owned Taubman mark where defendant operated website with domain name www.taubmansucks.com); Bally Total Fitness Holding Co. v. Faber, 29 F.Supp.2d 1161 (C.D. Cal. 1998) (holding there was no likelihood of confusion on part of plaintiff owning Bally mark where defendant operated website with domain name www.ballysucks.com).

Defendants registered the domain name <supercrete.com> in 1999 and have since used the domain to reroute web viewers to Concrete Solutions' primary website. The only difference between Plaintiff's registered mark of "Super-Crete" and Defendants' domain name of <supercrete.com> is the removal of the hyphen. Based on the case law, this minor variation makes Defendants' domain name confusingly similar to Plaintiff's mark. While Defendants argue that the hyphen is significant in modifying the term, this argument is contrary to the case law – and common sense. See Union Carbide Corp. v. Ever-Ready, Inc., 531 F.2d 366, 382 (7th Cir. 1976) ("[S]mall changes in words, such as adding or deleting a hyphen, are insufficient to distinguish marks."); Stix Products, Inc. v. United Merchants & Mfrs., Inc., 295 F.Supp. 479, 486 (S.D.N.Y. 1968) ("The absence of a hyphen . . . is of no significance, it is 'a distinction without a difference.'"); Safeway Stores v. Dunnell, 172 F.2d 649, 655-56 (9th Cir. 1949) (finding "Safe-Way" on toilet seat covers was an imitation of "Safeway" for supermarket stores). Further, the likelihood for consumer confusion is exacerbated here by the fact that both parties operate commercial websites marketing products in the same specific market for restoration and repair of existing concrete, and that both parties operate in the same geographic area. Accordingly, the court finds that Plaintiff is likely to be able to show that Defendants registered and use a domain name that is confusingly similar to Plaintiff's registered mark.

    **3.**    **Defendants' Bad Faith Intent to Profit**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

     To assist courts in the determination of bad faith intent under the statute, Congress enumerated a non-exclusive list of nine factors to be considered:
     (I) the trademark or other intellectual property rights of the person, if any, in the domain name;
     (II) the extent to which the domain name consists of the legal name of the person or a name that is otherwise commonly used to identify that person;
     (III) the person's prior use, if any, of the domain name in connection with the bona fide offering of any goods or services;
     (IV) the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name;
     (V) the person's intent to divert consumers from the mark owner's online location to a site accessible under the domain name that could harm the goodwill represented by the mark, either for commercial gain or with the intent to tarnish or disparage the mark, by creating a likelihood of confusion as to the source, sponsorship, affiliation, or endorsement of the site;
     (VI) the person's offer to transfer, sell, or otherwise assign the domain name to the mark owner or any third party for financial gain without having used, or having an intent to use, the domain name in the bona fide offering of any goods or services, or the person's prior conduct indicating a pattern of such conduct;
     (VII) the person's provision of material and misleading false contact information when applying for the registration of the domain name, the person's intentional failure to maintain accurate contact information, or the person's prior conduct indicating a pattern of such conduct;
     (VIII) the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties; and
     (IX) the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c).
15 U.S.C. § 1125(d)(B)(I).

     On balance, the relevant factors here favor a finding that Defendants acted with bad faith intent to profit from the <supercrete.com> domain name. Using the domain name solely to route potential web customers to Concrete Solutions' website, Defendants

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

make no claim to use of "supercrete" as a mark. Indeed, defendants state that they have never applied the term to any of their products. While Defendants contend that "supercrete" could be used as a purely descriptive term without infringing on a distinctive trademark, this argument has little merit precisely because Defendants admit to never using the term to describe their products. Instead, Defendants employ a domain name that is confusingly similar to a local competitor's mark for the sole purpose of directing web traffic to their commercial website, which offers products in direct competition with Plaintiff's. As such, it appears that Defendants only interest in the domain name is to divert customers who may have been searching for Plaintiff's mark to their own commercial website, as referenced in factor five. Further, Defendants' attempt to sell the domain to Plaintiff in 2007 suggests bad faith intent as referenced in factor six.

In opposition, Defendants argue that their registration of the site on March 17, 1999 – six months prior to Plaintiff's filing of the current trademark registrations on September 24, 1999 – suggests sufficient prior use of the site under factor three to negate a finding of bad faith intent. (Opposition at 10–12.) In support, Defendants rely largely on the finding of the WIPO panel that Plaintiff had not demonstrated use of the Marks in commerce prior to their trademark registration in September 1999.[4] As noted by Defendants, however, the findings of the WIPO panel are entitled to no deference here. See Barcelona.com, Inc. v. Excelentisimo Ayuntamiento de Barcelona, 330 F.3d 617, 624–26 (4th Cir. 2003) (noting that a WIPO Panel decision regarding the Uniform Domain Name Dispute Resolution Policy ("UDRP") was not entitled to deference in a federal court proceeding; stating "[b]ecause the administrative process prescribed by the UDRP is 'adjudication lite' as a result of its streamlined nature and its loose rules regarding applicable law, the UDRP itself contemplates judicial intervention, which can occur before, during, or after the UDRP's dispute resolution process is invoked. . . .

---

[4] Defendants suggest that Plaintiff's counsel violated his duty of candor to the court by failing to disclose the WIPO panel's ruling in the prior ex parte application. The existence of the WIPO decision was revealed in the materials presented to the Court, however, and the Court was aware of the issue when it ruled on Plaintiff's TRO application. As the TRO application was presented ex parte, Plaintiff's counsel should have affirmatively addressed the WIPO decision out of caution. See Campbell v. Rice, 408 F.3d 1166, 1175 (9th Cir. 2005) ("'[I]n an ex parte proceeding, a lawyer shall inform the tribunal of *all material facts known to the lawyer* which will enable the tribunal to make an informed decision, whether or not the facts are adverse.'" (quoting ABA Model Rules of Professional Conduct Rule 3.3(a)(4), (d) (2002). In light of the fact that the WIPO panel's decision is due no deference and that it was referenced in the materials presented, the Court cannot find Plaintiff's counsel clearly violated his duty of candor to the Court in this circumstance.

Moreover, any decision made by a panel under the UDRP is no more than an agreed-upon administration that is *not* given any deference under the ACPA."); Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft, 213 F. Supp.2d 612, 617 n.10 (E.D. Va. 2002) (in considering motions for summary judgment, the court evaluated UDRP decision and findings but noted that the decision was not admissible on the merits of the liability issues).

     Further, Plaintiff has submitted credible evidence suggesting that the "Super-Crete" mark was used in commerce well before Sadleir registered the disputed domain name in 1999. The original registration of the mark was made in 1975 and assigned by written contract to Plaintiff in 1995. Both registrations of the mark indicate that the date of first use in commerce was 1966. Holwitz has also declared that Plaintiff has continuously used the "Super-Crete" mark in connection with its products since 1995. Plaintiff additionally contends that Sadleir was aware of these activities well before registering the domain. Although Sadleir may not have been aware of the trademark registrations involved, it appears likely that he would be aware of a mark used by a local competitor within the relatively narrow market of concrete-surfacing products. The Court finds that the prior use factor weighs in favor of bad faith, rather than against.

     Finally, Defendants contend that their use of the <supercrete.com> domain name falls within the safe harbor provision of the statute. The ACPA contains a safe harbor provision, which states: "Bad faith intent described under subparagraph (A) shall not be found in any case in which the court determines that the person believed and had reasonable grounds to believe that the use of the domain name was a fair use or otherwise lawful." 15 U.S.C. § 1125(d)(1)(B)(ii). While not clearly stated, Defendants' reliance on the safe harbor provision appears to be based on the WIPO decision and the potential use of "supercrete" as a descriptive term. As noted, however, WIPO's decision is granted no deference here, and Defendants have expressly stated that they never used the term "supercrete" to describe their products. Further, the Ninth Circuit has found that "courts should 'make use of this "reasonable belief"' defense very sparingly and only in the most unusual cases.'" Lahoti, 586 F.3d at 1203 (quoting Audi AG v. D'Amato, 469 F.3d 534, 549 (6th Cir. 2006). Indeed, the Ninth Circuit went on to state that "'[a] defendant who acts even partially in bad faith in registering a domain name is not, as a matter of law, entitled to benefit from the [ACPA's] safe harbor provision.'" Id. (quoting Virtual Works, Inc. v. Volkswagen of Am., Inc., 238 F.3d 264, 270 (4th Cir. 2001)). Even if Defendants justifiably believed following the WIPO decision that their use of the domain name was lawful, there is no evidence to suggest this belief was well founded in the years prior to the WIPO decision, when Sadleir first used the domain to route customers to Concrete Solutions and offered to sell the domain name to Plaintiff at a premium. As

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

such, the court finds that Defendants were acting in at least partial bad faith since first registering the domain. Accordingly, the court finds for the purposes of this hearing that the safe harbor provision is not applicable. Based on the factors outlined in 15 U.S.C. § 1125(d)(B)(I) and the particular circumstances of this case, the court concludes that Defendants acted with bad faith intent in registering and using the <supercrete.com> domain name.

### 4. Defendants' Laches Defense

In opposition, Defendants argue that Plaintiff waited too long to bring its present claims related to the <supercrete.com> site and that the ACPA claim should be barred under the doctrine of laches. "Laches is an equitable time limitation on a party's right to bring suit, resting on the maxim that 'one who seeks the help of a court of equity must not sleep on his rights.'" Jarrow Formulas, Inc. v. Nutrition Now, Inc., 304 F.3d 829, 835 (9th Cir. 2002) (internal quotes and citations omitted). In evaluating a laches claim where an injunction is sought, courts first determine when the statute of limitations period expired for "the most closely analogous action under state law." Id. at 836. "If the plaintiff filed within that period, there is a strong presumption against laches. If the plaintiff filed outside that period, the presumption is reversed." Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n, 465 F.3d 1102, 1108 (9th Cir. 2006).

Here, neither party has suggested an analogous state law statute of limitations. As the cybersquatting claim at issue appears most similar to a state trademark infringement claim, the court will rely on the four-year statute of limitations for unspecified claims outlined in California Code of Civil Procedure § 343. See ATM Express, Inc. v. ATM Express, Inc., No. 07cv1293-L(RBB), 2009 U.S. Dist. LEXIS 83756, at *9 (S.D. Cal. Sept. 11, 2009) (applying California's four-year statute of limitations for state trademark infringement claims to ACPA cybersquatting claim in laches analysis); Miller v. Glenn Miller Prods., 318 F. Supp. 2d 923, 942 n. 11 (C.D. Cal. 2004) (applying state four-year statute of limitations to trademark infringement claim). The time period for a laches defense begins to accrue "when the plaintiff knew or should have known about the potential cause of action." Tillamook, 465 F.3d at 1108. Here, it appears that Plaintiff became aware of Defendants' use of the <supercrete.com> domain in late 1999, just months after it was first registered. Plaintiff waited until at least 2008, when the arbitration claim was filed with WIPO, however, to seek to enforce its claim to the domain site. This was a delay of more than eight years; four years past the analogous statute of limitations period. Accordingly, laches is presumed to apply.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

To consider whether Plaintiff's delay in filing suit was unreasonable, and therefore barred, the court must further consider the following six "E-systems" factors: "(1) the strength and value of the trademark rights asserted; (2) plaintiff's diligence in enforcing the mark; (3) harm to the senior user if relief is denied; (4) good faith ignorance by the junior user; (5) competition between senior and junior users; and (6) extent of harm suffered by the junior user because of the senior user's delay." Tillamook, 465 F.3d at 1102 (citing E-Systems, Inc. v. Monitek, Inc., 720 F.2d 604, 607 (9th Cir. 1983)). No direct evidence has been submitted regarding the value of Plaintiff's Marks or their efforts in defending them. Defendants' request for $15,000 as payment for the <supercrete.com> domain name, however, would suggest that the "Super-Crete" mark has some significant value. The harm to Plaintiff if relief is denied would likely be the ongoing use of its Marks by a competitor to lure customers to competing products, and there is no evidence of good faith ignorance by Defendants of this harm. Defendants cannot show clear prejudice resulting from the delay in bringing this action because they have invested nothing in developing or promoting the domain. See Internet Specialties West, Inc. v. Milon-DiGiorgio Enterprises, Inc, 559 F.3d 985, 990–92 (9th Cir. 2009) (finding that, although presumption of laches applied, domain name owners were not prejudiced by imposition of preliminary injunction, as their claim of prejudice was based on "mere[ ] expenditures in promoting the infringed name" and not "an investment in the mark [ ] as the identity of the business in the minds of the public."). While Defendants argue that they would be prejudiced in seeking witnesses to Plaintiff's prior use of the "Super-Crete" mark before 1999, it appears that this mark was in fact registered as early as 1975. Defendants' argument is speculative at best. Accordingly, Defendants cannot demonstrate clear prejudice as a result of Plaintiff's delay in bringing this action. For this reason, the court finds that the laches defense is unlikely to succeed here.

### 5. Conclusion Regarding Likelihood of Success on the Merits

For the foregoing reasons, the court finds that Plaintiff is likely to succeed on the merits of its ACPA claim.

### C. Irreparable Injury

Plaintiff contends that it will suffer irreparable injury if Defendants transfer control over the <supercrete.com> domain before it can gain control of the site because it will

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

lose its desired remedy of gaining control of the site.[5]  "[P]reliminary injunctive relief is available only if plaintiffs 'demonstrate that irreparable injury is likely in the absence of an injunction.'"  Johnson v. Couturier, 572 F.3d 1067, 1081 (9th Cir. 2009) (quoting *Winter*, 129 S.Ct. 375).  If the harm to plaintiff is merely monetary, it "will not usually support injunctive relief."  American Trucking, 559 F.3d at 1057; see also California Pharmacists Ass'n v. Maxwell-Jolly, 563 F.3d 847, 851-52 (9th Cir. 2009) ("Typically, monetary harm does not constitute irreparable harm. . . .  [E]conomic damages are not traditionally considered irreparable because the injury can later be remedied by a damage award.").  In addition, harm that is "merely speculative" will not support injunctive relief, "although a loss of goodwill and reputation can do so."  American Trucking, 559 F.3d at 1057.  Even if Plaintiff establishes success on the merits, "the absence of a substantial likelihood of irreparable injury would, standing alone, make preliminary injunctive relief improper."  Siegel v. Le Pore, 234 F.3d 1163, 1176 (11th Cir. 2000).

In a trademark infringement case, "[i]rreparable injury is ordinarily presumed upon a showing of a likelihood of success."  Abercrombie & Fitch Co. v. Moose Creek, Inc., 486 F.3d 629, 633 (9th Cir. 2007); Vision Sports, Inc. v. Melville Corp., 888 F.2d 609, 612 n. 3 (9th Cir. 1989) ("In trademark infringement or unfair competition actions, once the plaintiff establishes a likelihood of confusion, it is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not granted.").  This presumption has also been applied to infringement claims under the ACPA.  See Grooms v. Legge, No. 09cv489 - IEG - POR, 2009 U.S. Dist. LEXIS 21456, at *28–29 (S.D. Cal. Mar. 17, 2009).

Even without this presumption, Plaintiff has demonstrated irreparable injury based on the threatened loss of prospective customers who would be diverted away from its website should it be unable to gain control over the domain name.  In Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc., 240 F.3d 832, 841 (9th Cir. 2001), the Ninth Circuit found threatened loss of prospective customers and goodwill constitutes irreparable harm in the trademark context.  In the instant case, the threat of an ongoing loss of prospective customers if Plaintiff should be prevented from gaining control of the <supercrete.com> domain supports a finding of irreparable harm.

---

[5] Defendants contend that Plaintiff's evidence of this potential harm – an email from Defendants' counsel suggesting that Defendants might sell the site to a third party – is inadmissable under Federal Rule of Evidence 408.  Rule 408 only bars admission of offers to compromise, however, "when offered to prove liability for, invalidity of, or amount of a claim that was disputed as to validity or amount."  Because the evidence here was not used to support liability or a damage amount, it is not barred.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

  **D.**  **Balance of the Equities**

  "A preliminary injunction is an extraordinary remedy never awarded as of right." Winter, 129 S.Ct. at 376. "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." Amoco Production Co. v. Village of Gambell, Alaska, 480 U.S. 531, 542 (1987). The balance of equities here tips sharply toward Plaintiff, who would be forced to file new claims against third parties potentially beyond this Court's jurisdiction if Defendants were to sell the domain before the conclusion of this litigation. Defendants' suggestion that Plaintiff could simply file another WIPO claim if this were to happen is disingenuous in light of the WIPO's prior decision. Further, as Defendants do not suggest that they will lose an impending sale if prevented from marketing the site during the pendency of this action, it is not clear that Defendants will be harmed in any real way by this limited delay in their ability to transfer the site to a third party. Accordingly, the Court finds this factor also weighs in favor of granting the preliminary injunction.

  **E.**  **Public Interest**

  "In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982). "The public interest analysis for the issuance of a preliminary injunction requires [the court] to consider 'whether there exists some critical public interest that would be injured by the grant of preliminary relief.'" Maxwell-Jolly, 572 F.3d at 659 (quoting Hybritech Inc. v. Abbott Laboratories, 849 F.2d 1446, 1458 (Fed. Cir. 1988)). Plaintiff suggests that the public interest will benefit by removing a potential future threat of confusion related to the Marks. "The likelihood of confusion to consumers is the critical factor in [the] consideration" of harm to the public, as "[t]he public has an interest in avoiding confusion between two companies' products." Internet Specialties West, Inc., 559 F.3d at 993 n.5 (9th Cir. 2009). In light of the limited scope of the present preliminary injunction, the Courts finds that the impact on the public interest will be limited, particularly because the preliminary injunction simply maintains the current status quo. What public interest there is, however, weighs in favor of granting the injunction.

### III.  CONCLUSION

  For the foregoing reasons, the Court finds that the relevant factors weigh in favor of granting Plaintiff's application for preliminary injunction. Therefore, Plaintiff's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

request for a preliminary injunction is GRANTED. Defendants, their affiliates, parents, subsidiaries, officers, agents, representatives, servants, employees, and attorneys and anyone acting on Defendants' behalf, are ENJOINED from selling or transferring the domain name <supercrete.com> until further order of the Court.

      IT IS SO ORDERED.